# EXHIBIT A



**MetLife Insurance Company USA**
**P O Box 10366**
**Des Moines, IA 50306-0366**

RE: LARRY M GRAY
    SHERRAN L GRAY
    224031268

Dear Representative:

Thank you for choosing MetLife Insurance Company USA. We are committed to providing you and your client with competitive products and high quality service. Enclosed is the MetLife Insurance Company USA Annuity Contract for delivery to the Owner.

The contract may be accompanied by an Amendment of Application or Purchase Confirmation and Acknowledgement Form.  Contracts issued with information obtained to correct or complete the original application will include an Amendment of Application. Those issued from app-less business will include a Purchase Confirmation and Acknowledgement Form. When received with the contract, the appropriate form must be signed and returned to us within 30 days.

We appreciate your business and look forward to providing you and your client with excellent service. If you have any questions please contact a service representative at (800) 709-2906.

Sincerely,

MetLife Annuity Operations & Services

THIS PAGE INTENTIONALLY LEFT BLANK

# MetLife

**MetLife Insurance Company USA**
**P O Box 10366**
**Des Moines, IA 50306-0366**

RE: LARRY M GRAY
    SHERRAN L GRAY
    224031268

Dear Owner:

Thank you for your recent purchase of a MetLife Insurance Company USA Annuity. Your new contract is enclosed.

Your initial investment is $98,128.59. If this investment was obtained from the proceeds of any full or partial surrender, loan or withdrawal from any existing life insurance policy or annuity contract, please contact a MetLife Insurance Company USA Representative at the toll-free number listed below.

Your initial investment allocation will be reflected on your confirmation notice which will be mailed to you separately.

We appreciate your business and look forward to providing you with excellent service.  If you have any questions, please contact a service representative at (800) 709-2906.

Sincerely,

MetLife Annuity Operations & Services

THIS PAGE LEFT INTENTIONALLY BLANK

**METLIFE INSURANCE COMPANY USA**

PURCHASE CONFIRMATION AND ACKNOWLEDGEMENT FORM

**INSTRUCTIONS AND CHECKLIST**

[ ] Correct Social Security Number Section, if needed
[ ] Review Beneficiary Designation Section, correct names if needed, or, if blank, provide information
[ ] Read Acknowledgement Section
[ ] Sign and date this form
[ ] Return the Completed form(s) in the postage-paid envelope at your earliest convenience.

**PLEASE NOTE:**  If this form is not signed and returned, a delay in processing may occur and a signature guarantee will be required prior to processing any transaction or change,  including withdrawals.

| | |
|---|---|
| **Contract Number:** | 224031268 |
| **Annuitant:** | LARRY M GRAY |
| **Owner:** | LARRY M GRAY |
| **Joint Owner:** | SHERRAN L GRAY |

**SOCIAL SECURITY NUMBER**

Owner's Social Security (Tax I.D.)
Number: ▮▮▮▮▮▮

Joint Owner's Social Security
Number: ▮▮▮▮▮▮

Social Security Number
Corrected To: _____-_____-_____

Social Security Number
Corrected To: _____-_____-_____

**BENEFICIARY DESIGNATION**

Unless this form is completed and returned to MetLife Insurance Company USA or the beneficiary is subsequently changed by written notice, the beneficiary is the estate of the Owner. Give relationship(s) to Owner, Social Security Number(s), and percentage each is to receive.

**PRIMARY BENEFICIARY**

| NAME | RELATIONSHIP TO OWNER | PERCENTAGE |
|---|---|---|
| SHERRAN L GRAY | Spouse | 100.00% |

**Copy**

224031268

**PLAN TYPE:**     Non-Qualified

Is this annuity being purchased to replace any existing life insurance or annuity policy(ies)? [ ] Yes   [X] No

**ADDITIONAL INFORMATION:** Please initial all changes on this form or use the enclosed Policy Service Request Form to provide additional beneficiary information or make any other additions or correction at this time.

**ACKNOWLEDGEMENT AND AGREEMENT:** I (We) agree that the above and the following information and statements are true and correct.

- I (We) acknowledge that the allocation of the initial purchase payment is as follows:

  | | |
  |---|---|
  | 3 Year Shield 10 S&P 500$^®$Index | 34.00% |
  | 3 Year Shield 10 Russell 2000$^®$Index | 33.00% |
  | 3 Year Shield 10 NASDAQ-100$^®$Index | 33.00% |

- I (We) certify that the Social Security Number or T.I.N. shown on the reverse side is my (our) correct Tax I.D. Number and that I (we) am not subject to backup withholding as a result of failure to report all interest or dividends or because the I.R.S. has notified me (us) that I (we) am no longer subject to backup withholding.

- I (We) acknowledge receipt of the current MetLife Insurance Company USA Deferred Annuity MetLife Shield Level Selector$^{SM}$ Prospectus.

- I (We) acknowledge that I (we) have elected the Standard Death Benefit Option.

- I (We) acknowledge receipt of the enclosed MetLife Insurance Company USA Privacy Notice to our Customers.

| | |
|---|---|
| _____ | _____ |
| Date | Signature of Owner |
| _____ | _____ |
| Date | Signature of  Joint Owner |
| _____ | _____ |
| Date | Signature of Annuitant |

If you have any questions or require any assistance in completing this form please contact your registered representative or our Policy Service Office at:

MetLife Insurance Company USA
Policy Service Office
P.O. Box 10366
Des Moines,IA 50306-0366
1-800-709-2906

Please complete this form and return it to us in the postage-paid envelope provided with this form.

**THIS FORM MUST BE SIGNED AND RETURNED TO US EVEN IF NO CHANGES ARE MADE.  IF THIS ANNUITY CONFIRMATION FORM IS NOT SIGNED AND RETURNED, A SIGNATURE GUARANTEE WILL BE REQUIRED PRIOR TO PROCESSING ANY TRANSACTION OR CHANGE, INCLUDING WITHDRAWALS.**

ADDITIONAL INFORMATION

CONTINGENT BENEFICIARY

| NAME | RELATIONSHIP TO OWNER | PERCENTAGE |
|---|---|---|
| VICKI CUNNINGHAM | Child | 50.00% |
| LARRY M GRAY JR | Child | 50.00% |

Copy

**METLIFE INSURANCE COMPANY USA**

PURCHASE CONFIRMATION AND ACKNOWLEDGEMENT FORM

**INSTRUCTIONS AND CHECKLIST**

[ ] Correct Social Security Number Section, if needed
[ ] Review Beneficiary Designation Section, correct names if needed, or, if blank, provide information
[ ] Read Acknowledgement Section
[ ] Sign and date this form
[ ] Return the Completed form(s) in the postage-paid envelope at your earliest convenience.

**PLEASE NOTE:**  If this form is not signed and returned, a delay in processing may occur and a signature guarantee will be required prior to processing any transaction or change,  including withdrawals.

| | |
|---|---|
| **Contract Number:** | 224031268 |
| **Annuitant:** | LARRY M GRAY |
| **Owner:** | LARRY M GRAY |
| **Joint Owner:** | SHERRAN L GRAY |

**SOCIAL SECURITY NUMBER**

Owner's Social Security (Tax I.D.)
Number: ▓▓▓▓▓▓

Joint Owner's Social Security
Number: ▓▓▓▓▓▓

Social Security Number
Corrected To: _____-_____-_____

Social Security Number
Corrected To: _____-_____-_____

**BENEFICIARY DESIGNATION**

Unless this form is completed and returned to MetLife Insurance Company USA or the beneficiary is subsequently changed by written notice, the beneficiary is the estate of the Owner. Give relationship(s) to Owner, Social Security Number(s), and percentage each is to receive.

**PRIMARY BENEFICIARY**

| **NAME** | **RELATIONSHIP TO OWNER** | **PERCENTAGE** |
|---|---|---|
| SHERRAN L GRAY | Spouse | 100.00% |

**PLAN TYPE:**     Non-Qualified

Is this annuity being purchased to replace any existing life insurance or annuity policy(ies)? [ ] Yes   [X] No

**ADDITIONAL INFORMATION:**   Please initial all changes on this form or use the enclosed Policy Service Request Form to provide additional beneficiary information or make any other additions or correction at this time.

**ACKNOWLEDGEMENT AND AGREEMENT:**   I (We) agree that the above and the following information and statements are true and correct.

- I (We) acknowledge that the allocation of the initial purchase payment is as follows:

  | | |
  |---|---|
  | 3 Year Shield 10 S&P 500® Index | 34.00% |
  | 3 Year Shield 10 Russell 2000® Index | 33.00% |
  | 3 Year Shield 10 NASDAQ-100® Index | 33.00% |

- I (We) certify that the Social Security Number or T.I.N. shown on the reverse side is my (our) correct Tax I.D. Number and that I (we) am not subject to backup withholding as a result of failure to report all interest or dividends or because the I.R.S. has notified me (us) that I (we) am no longer subject to backup withholding.

- I (We) acknowledge receipt of the current MetLife Insurance Company USA Deferred Annuity MetLife Shield Level Selector<sup>SM</sup> Prospectus.

- I (We) acknowledge that I (we) have elected the Standard Death Benefit Option.

- I (We) acknowledge receipt of the enclosed MetLife Insurance Company USA Privacy Notice to our Customers.

| | |
|---|---|
| _____ | _____ |
| Date | Signature of Owner |
| _____ | _____ |
| Date | Signature of Joint Owner |
| _____ | _____ |
| Date | Signature of Annuitant |

If you have any questions or require any assistance in completing this form please contact your registered representative or our Policy Service Office at:

MetLife Insurance Company USA
Policy Service Office
P.O. Box 10366
Des Moines, IA 50306-0366
1-800-709-2906

Please complete this form and return it to us in the postage-paid envelope provided with this form.

**THIS FORM MUST BE SIGNED AND RETURNED TO US EVEN IF NO CHANGES ARE MADE.  IF THIS ANNUITY CONFIRMATION FORM IS NOT SIGNED AND RETURNED, A SIGNATURE GUARANTEE WILL BE REQUIRED PRIOR TO PROCESSING ANY TRANSACTION OR CHANGE, INCLUDING WITHDRAWALS.**

ADDITIONAL INFORMATION

CONTINGENT BENEFICIARY

| NAME | RELATIONSHIP TO OWNER | PERCENTAGE |
|---|---|---|
| VICKI CUNNINGHAM | Child | 50.00% |
| LARRY M GRAY JR | Child | 50.00% |

Note: Keep this copy with the Contract

# MetLife

## Our Privacy Notice

We know that you buy our products and services because you trust us. This notice explains how we protect your privacy and treat your personal information. It applies to current and former customers. "Personal information" here means anything we know about you personally.

### Protecting Your Information

We take important steps to protect your personal information. We treat it as confidential. We tell our employees to take care in handling it. We limit access to those who need it to perform their jobs. Our outside service providers must also protect it, and use it only to meet our business needs. We also take steps to protect our systems from unauthorized access. We comply with all laws that apply to us.

### Collecting Your Information

We typically collect your name, address, age, and other relevant information. For example, we may ask about your:

- finances
- creditworthiness
- employment

We may also collect information about any business you have with us, our affiliates, or other companies. Our affiliates include life, car, and home insurers. They also include a legal plans company and securities broker-dealers. In the future, we may also have affiliates in other businesses.

### How We Get Your Information

We get your personal information mostly from you. We may also use outside sources to help ensure our records are correct and complete. These sources may include consumer reporting agencies, employers, other financial institutions, adult relatives, and others. These sources may give us reports or share what they know with others. We do not control the accuracy of information outside sources give us. If you want to make any changes to information we receive from others about you, you must contact those sources.

### Using Your Information

We collect your personal information to help us decide if you're eligible for our products or services. We may also need it to verify identities to help deter fraud, money laundering, or other crimes. How we use this information depends on what products and services you have or want from us. It also depends on what laws apply to those products and services. For example, we may also use your information to:

- administer your products and services
- process claims and other transactions
- perform business research
- confirm or correct your information
- market new products to you
- help us run our business
- comply with applicable laws

### Sharing Your Information With Others

We may share your personal information with your consent or as permitted or required by law. For example, we may share your information with businesses hired to carry out services for us. We may also share it with our affiliated or unaffiliated business partners through joint marketing agreements. In those situations, we share your information to jointly offer you products and services or have others offer you products and services we endorse or sponsor.

Other reasons we may share your information include:

- doing what a court, law enforcement, or government agency requires us to do (for example, complying with search warrants or subpoenas)
- telling another company what we know about you if we are selling or merging any part of our business
- giving information to a governmental agency so it can decide if you are eligible for public benefits
- giving your information to someone with a legal interest in your assets (for example, creditor with a lien on your account)
- those listed in our "Using Your Information" section above.

Additionally, in certain circumstances, your representative may be permitted to take your information if he/she changes firms so that he/she may continue to provide services to you through the new firm.

## Opting Out

**Affiliate Sharing/Joint Marketing.**   You may tell us not to share your information with our affiliates for their own marketing purposes or unaffiliated business partners as part of a joint marketing arrangement.  Even if you do not "opt out," we will not share your information with unaffiliated companies for their own marketing purposes without a joint marketing arrangement.  We will give you an "opt out" form when we first issue your policy.  You can also "opt out" anytime by contacting us at the address below.

**Representatives Changing Firms.**   If you do not want us to share your information with your representative if he/she changes firms, contact us at the address provided below.  Some states require us to get your affirmative consent.  If your representative is permitted to take information to another firm and you live in one of those states, we will instruct you on how you can consent to our sharing your personal information before your representative moves to another firm. Your representative's continued use of your transferred information will be subject to the new firm's privacy policy.

MetLife Privacy Office
P. O. Box 489
Warwick, Rhode Island 02887-9954
(877) 638-7684
www.metlife.com/optout

If you hold a policy or account jointly with someone else, we will accept instructions from either of you, and apply them to the entire policy or account.

## Accessing and Correcting Your Information

You may ask us for a copy of the personal information we have about you.  Generally, we will provide it as long as it is reasonably retrievable and within our control. You must make your request in writing listing the account or policy numbers with the information you want to access.  For legal reasons, we may not show you anything we learned as part of a claim or lawsuit, unless required by law.

If you tell us that what we know about you is incorrect, we will review it.  If we agree, we will update our records. Otherwise, you may dispute our findings in writing, and we will include your statement whenever we give your disputed information to anyone outside MetLife.

## Questions

We want you to understand how we protect your privacy.  If you have any questions about this notice, please contact us. When you write, include your name, address, and policy or account number.

**Send privacy questions to:**

MetLife Privacy Office
P. O. Box 489
Warwick, RI 02887-9954
privacy@metlife.com

We may revise this privacy notice.  If we make any material changes, we will notify you as required by law.  We provide this privacy notice to you on behalf of these MetLife companies:

**Metropolitan Life Insurance Company**          **First MetLife Investors Insurance Company**
**New England Life Insurance Company**            **General American Life Insurance Company**
**MetLife Insurance Company USA**                  **Metropolitan Tower Life Insurance Company**

CPN-IB-ANNUITY (2014)

**ANNUITY CONTRACT**

The following is your Annuity Contract. Any materials that preceded this page or that follow the last page of the Annuity Contract are not part of your Contract. Please retain this Annuity Contract with your permanent records.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# METLIFE INSURANCE COMPANY USA

(A Stock Company)

1209 Orange Street
Wilmington, DE  19801

**NOTICE**
To obtain information about your policy or if you need assistance or need help in resolving a complaint, you may call (800)-709-2906.

**MetLife Insurance Company USA** (referred to as "we", "us", "our", and the "Company") will make Income Payments as described in this Contract beginning on the Annuity Date.

This Policy is a legal contract between the policyholder and the Company.

## FREE LOOK PROVISION - RIGHT TO CANCEL
This Contract may be returned for any reason within 10 days after you receive it by mailing or delivering the Contract to either us or the agent who sold it. Return of this Contract by mail is effective on being postmarked, properly addressed and postage prepaid. We will promptly refund your Purchase Payment as of the Business Day we receive your Contract.

Signed for the Company.

Secretary                                                                    President

## SINGLE PREMIUM DEFERRED ANNUITY CONTRACT

This Contract contains Shield Options and a Fixed Account.  The initial interest rate for the Fixed Account is guaranteed for one year.

### NONPARTICIPATING

### READ YOUR CONTRACT  CAREFULLY.

**VALUES AND DETERMINATION OF ANNUITY PAYMENTS PROVIDED BY THIS CONTRACT, WHEN BASED ON THE VALUE OF THE SHIELD OPTION(S), ARE VARIABLE, MAY INCREASE OR DECREASE, AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNT.**

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| CONTRACT SCHEDULE | 3 |
| DEFINITIONS | 4 |
| GENERAL PROVISIONS | 5 |
| ANNUITANT, OWNERSHIP, ASSIGNMENT PROVISIONS | 6 |
| BENEFICIARY PROVISIONS | 7 |
| PURCHASE PAYMENT PROVISIONS | 7 |
| RENEWAL PROVISIONS | 8 |
| ACCOUNT VALUE PROVISIONS | 8 |
| WITHDRAWAL PROVISIONS | 11 |
| DEATH BENEFIT PROVISIONS | 11 |
| ANNUITY PROVISIONS | 12 |

## CONTRACT SCHEDULE

**OWNER:** LARRY M GRAY                                 **SEX:** M          **AGE AT ISSUE:** 70
**JOINT OWNER:** SHERRAN L GRAY              **SEX:** F          **AGE AT ISSUE:** 70
**ANNUITANT:** LARRY M GRAY                   **SEX:** M          **AGE AT ISSUE:** 70
**CONTRACT NUMBER:** 224031268              **ISSUE DATE:** March 17, 2016
**PLAN TYPE:** Non-Qualified                       **ANNUITY DATE:** July 1, 2035

**SINGLE PURCHASE PAYMENT:**  $98,128.59

**SHIELD OPTIONS**

**SEPARATE ACCOUNT:**    MICC Separate Account SA

**Shield Options and Indices by Term Available at Issue:**

**Each Shield Option will have an associated Cap Rate or a Step Rate.**

| Shield Options | | |
|---|---|---|
| **Term** | **Index** | **Minimum Guaranteed Cap/Step Rate** |
| **Shield 100** | | |
| 1 Year Term | S&P 500® Index[1] | 1.00% |
| | S&P 500® Index Step Rate | 1.00% |
| **Shield 25** | | |
| 6 Year Term | S&P 500® Index | 10.00% |
| | Russell 2000® Index | 10.00% |
| | MSCI EAFE Index | 10.00% |
| **Shield 15** | | |
| 3 Year Term | S&P 500® Index | 6.00% |
| | Russell 2000® Index | 6.00% |
| | MSCI EAFE Index | 6.00% |
| 6 Year Term | S&P 500® Index | 12.00% |
| | Russell 2000® Index | 12.00% |
| | MSCI EAFE Index | 12.00% |
| **Shield 10** | | |
| 1 Year Term | S&P 500® Index | 3.00% |
| | S&P 500® Index Step Rate | 1.50% |
| | Russell 2000® Index[2] | 3.00% |
| | NASDAQ-100 Index®[3] | 3.00% |
| | MSCI EAFE Index[4] | 3.00% |
| | Bloomberg Commodity Index[SM5] | 1.00% |
| 3 Year Term | S&P 500® Index | 8.00% |
| | S&P 500® Index Step Rate | 4.00% |
| | Russell 2000® Index | 8.00% |
| | NASDAQ-100 Index® | 8.00% |
| | MSCI EAFE Index | 8.00% |
| | Bloomberg Commodity Index[SM] | 3.00% |
| 6 Year Term | S&P 500® Index | 25.00% |
| | Russell 2000® Index | 25.00% |
| | MSCI EAFE Index | 25.00% |

L-22495 (09/12)

**For the Shield 100 Option, the Shield Rate will be treated as fully accrued during the entire Term.   A Shield 100 Option will be available for at least the first 6 Contract Years, subject to the Transfer Requirements below.**

Index-linked returns do not include the portion of returns generated by dividends; and the elements used in determining the credited rate from the index are not guaranteed and can be changed by the Company, subject to any contract guarantees, and any such changes can affect the return.

## FIXED ACCOUNT

| | |
|---|---|
| **Minimum Guaranteed Interest Rate:** | 1.00% annually |
| **Interest Rate Term:** | 1 year |
| **Minimum Allocation:** | $500 |

**TRANSFER REQUIREMENTS:**

**TRANSFER PERIOD:**

The 5 Calendar Days following the Contract Anniversary coinciding with the end of the Term for each applicable Shield Option and/or the end of the Interest Rate Term for the Fixed Account.

**TRANSFERS:**

During the Accumulation Period you may only make a transfer to the Fixed Account and to a new Shield Option(s) during the Transfer Period, subject to availability.   The effective date of such transfer is the first day of the Fixed Account Interest Rate Term and/or Shield Option(s) to which the transfer is made.

At the end of the Term, the Investment Amount will automatically be renewed into the same Shield Option unless you elect to transfer into a different Shield Option or the Fixed Account Option at that time.  If the Shield Option is no longer available at the end of the existing Term, these amounts will automatically transfer into the Fixed Account at the end of the Term unless otherwise directed by You. If the Fixed Account is not available, these amounts will automatically transfer into the Shield Option with, in order of priority, the shortest Term, the highest Shield Rate, and the lowest Cap Rate from the Shield Options available at the end of the Term unless otherwise directed by You.

At the end of the Interest Rate Term, the Fixed Account Value will automatically be renewed into the Fixed Account unless you elect to transfer into a Shield Option at that time.  If the Fixed Account is no longer available at the end of the existing Fixed Account Term, these amounts will automatically transfer into the Shield Option with, in order of priority, the shortest Term, the highest Shield Rate, and the lowest Cap Rate from the Shield Options available at the end of the Interest Rate Term unless otherwise directed by You.

**BENEFICIARY:**   As designated by you as of the Issue Date unless changed in accordance with the Contract provisions.

**WITHDRAWALS:**

**Free Withdrawal Amount:** Each Contract Year after the first Contract Year, you may withdraw a portion of your Account Value free from any Withdrawal Charge.  The Free Withdrawal Amount each Contract Year is equal to 10% of the Account Value as of the prior Contract Anniversary less the total amount withdrawn, as described in the Withdrawal Provisions, from the Account Value in the current Contract Year. The Free Withdrawal Amount is non-cumulative and is not carried over to other Contract Years.

**Withdrawal Charge:**  The Withdrawal Charge is a percentage of the amount withdrawn from the Account Value in a Contract Year in excess of the Free Withdrawal Amount. The Withdrawal Charge is calculated at the time of each withdrawal using the appropriate withdrawal charge percentage from the following schedule:

**WITHDRAWAL CHARGE PERCENTAGES**

| Number of Complete Contract Years Since Issue Date | % Charge |
|---|---|
| 0 | 9% |
| 1 | 8% |
| 2 | 8% |
| 3 | 7% |
| 4 | 6% |
| 5 | 5% |
| 6 or more | 0% |

In addition to any waiver of Withdrawal Charges set forth in the Contract or Rider(s), no Withdrawal Charge will be deducted from the Account Value in the event of:

1. Maturity of the Contract; or
2. Payment of the Death Benefit; or
3. Application of your Account Value to an Annuity Option; or
4. If the withdrawal is required for you to avoid Federal Income Tax penalties or to satisfy Federal Income Tax rules concerning minimum distribution requirements that apply to this annuity (except for RMDs on a decedent Roth IRA.) For purposes of this exception, we assume that this annuity is the only contract or funding vehicle from which distributions are required to be taken, and we will ignore all other Account Values; or
5. If you properly "re-characterize" as permitted under Federal Tax Law your traditional IRA deferred annuity or Roth IRA deferred annuity issued by us; or
6. If we agree in writing that none will apply. For example, we may waive the Withdrawal Charge if you directly transfer the amount withdrawn to a funding vehicle pre-approved by us.

**Minimum Partial Withdrawal:**            $500.00

**Minimum Account Value which must remain in the Contract after a Partial Withdrawal: $2,000.00**

**ANNUITY OPTION INFORMATION:**

1. The Annuity Date must be the first day of a calendar month.  Unless otherwise directed by you, the Annuity Date is the first day of the calendar month following the Annuitant's 90th birthday or 10 years from the Issue Date, whichever is later, or a later date if we agree.
2. The Annuity Date must not be less than 13 months from the Issue Date.
3. For Income Payments, the Fixed Annuity Tables are based on the Annuity 2000 Mortality Table with 15 years of mortality improvement based upon projection Scale AA, a 7 year age setback and interest at 1.00%.

**ANNUITY SERVICE OFFICE:**
MetLife Insurance Company USA
P.O. Box 10366
Des Moines, IA 50306-0366
1-800-709-2906

L-22495 (09/12)

**ENDORSEMENTS AND RIDERS ATTACHED TO THIS CONTRACT:**

Fixed Account Rider
Waiver of Withdrawal Charge for Nursing Home Confinement Rider
Waiver of Withdrawal Charge for Terminal Illness Rider
Individual Non-Qualified Annuity Endorsement

---

[1] The S&P 500 Index is a product of S&P Dow Jones Indices LLC ("SPDJI"), and has been licensed for use by MetLife Insurance Company USA. Standard & Poor's®, S&P® and S&P 500® are registered trademarks of Standard & Poor's Financial Services LLC ("S&P"); Dow Jones® is a registered trademark of Dow Jones Trademark Holdings LLC ("Dow Jones"); and these trademarks have been licensed for use by SPDJI and sublicensed for certain purposes by MetLife Insurance Company USA. MetLife Shield Level Selector℠ Annuity is not sponsored, endorsed, sold or promoted by SPDJI, Dow Jones, S&P, any of their respective affiliates (collectively, "S&P Dow Jones Indices"). S&P Dow Jones Indices makes no representation or warranty, express or implied, to the owners of the MetLife Shield Level Selector℠ Annuity or any member of the public regarding the advisability of investing in securities generally or in MetLife Shield Level Selector℠ Annuity particularly or the ability of the S&P 500 Index to track general market performance. S&P Dow Jones Indices' only relationship to MetLife Insurance Company USA with respect to the S&P 500 Index is the licensing of the Index and certain trademarks, service marks and/or trade names of S&P Dow Jones Indices or its licensors. The S&P 500 Index is determined, composed and calculated by S&P Dow Jones Indices without regard to MetLife Insurance Company USA or the MetLife Shield Level Selector℠ Annuity. S&P Dow Jones Indices have no obligation to take the needs of MetLife Insurance Company USA or the owners of MetLife Shield Level Selector℠ Annuity into consideration in determining, composing or calculating the S&P 500 Index. S&P Dow Jones Indices is not responsible for and has not participated in the determination of the prices, and amount of MetLife Shield Level Selector℠ Annuity or the timing of the issuance or sale of MetLife Shield Level Selector℠ Annuity or in the determination or calculation of the equation by which MetLife Shield Level Selector℠ Annuity is to be converted into cash, surrendered or redeemed, as the case may be. S&P Dow Jones Indices has no obligation or liability in connection with the administration, marketing or trading of MetLife Shield Level Selector℠ Annuity. There is no assurance that investment products based on the S&P 500 Index will accurately track index performance or provide positive investment returns. S&P Dow Jones Indices LLC is not an investment advisor. Inclusion of a security within an index is not a recommendation by S&P Dow Jones Indices to buy, sell, or hold such security, nor is it considered to be investment advice. Notwithstanding the foregoing, CME Group Inc. and its affiliates may independently issue and/or sponsor financial products unrelated to MetLife Shield Level Selector℠ Annuity currently being issued by MetLife Insurance Company USA, but which may be similar to and competitive with MetLife Shield Level Selector℠ Annuity. In addition, CME Group Inc. and its affiliates may trade financial products which are linked to the performance of the S&P 500 Index.

S&P DOW JONES INDICES DOES NOT GUARANTEE THE ADEQUACY, ACCURACY, TIMELINESS AND/OR THE COMPLETENESS OF THE S&P 500 INDEX OR ANY DATA RELATED THERETO OR ANY COMMUNICATION, INCLUDING BUT NOT LIMITED TO, ORAL OR WRITTEN COMMUNICATION (INCLUDING ELECTRONIC COMMUNICATIONS) WITH RESPECT THERETO. S&P DOW JONES INDICES SHALL NOT BE SUBJECT TO ANY DAMAGES OR LIABILITY FOR ANY ERRORS, OMISSIONS, OR DELAYS THEREIN. S&P DOW JONES INDICES MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE OR AS TO RESULTS TO BE OBTAINED BY METLIFE INSURANCE COMPANY USA, OWNERS OF THE METLIFE SHIELD LEVEL SELECTOR℠ ANNUITY, OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE S&P 500 INDEX OR WITH RESPECT TO ANY DATA RELATED THERETO. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT WHATSOEVER SHALL S&P DOW JONES INDICES BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, TRADING LOSSES, LOST TIME OR GOODWILL, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE. THERE ARE NO THIRD PARTY BENEFICIARIES OF ANY AGREEMENTS OR ARRANGEMENTS BETWEEN S&P DOW JONES INDICES AND METLIFE INSURANCE COMPANY USA, OTHER THAN THE LICENSORS OF S&P DOW JONES INDICES.

[2] The MetLife Shield Level Selector℠ Annuity is not sponsored, endorsed, sold or promoted by Frank Russell Company ("Russell"). Russell makes no representation or warranty, express or implied, to the owners of the MetLife Shield Level Selector℠ Annuity or any member of the public regarding the advisability of investing in

securities generally or in the MetLife Shield Level Selector[SM] Annuity particularly or the ability of the Russell 2000® Index to track general stock market performance or a segment of the same.  Russell's publication of the Russell 2000® Index in no way suggests or implies an opinion by Russell as to the advisability of investment in any or all of the securities upon which the Russell 2000® Index is based.  Russell's only relationship to MetLife Insurance Company USA is the licensing of certain trademarks and trade names of Russell and of the Russell 2000® Index which is determined, composed and calculated by Russell without regard to MetLife Insurance Company USA or the MetLife Shield Level Selector[SM] Annuity.  Russell is not responsible for and has not reviewed the MetLife Shield Level Selector[SM] Annuity nor any associated literature or publications and Russell makes no representation or warranty express or implied as to their accuracy or completeness, or otherwise. Russell reserves the right, at any time and without notice, to alter, amend, terminate or in any way change the Russell 2000® Index. Russell has no obligation or liability in connection with the administration, marketing or trading of the MetLife Shield Level Selector[SM] Annuity.

RUSSELL DOES NOT GUARANTEE THE ACCURACY AND/OR THE COMPLETENESS OF THE RUSSELL 2000® INDEX OR ANY DATA INCLUDED THEREIN AND RUSSELL SHALL HAVE NO LIABILITY FOR ANY ERRORS, OMISSIONS, OR INTERRUPTIONS THEREIN. RUSSELL MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY METLIFE INSURANCE COMPANY USA, INVESTORS, OWNERS OF THE METLIFE SHIELD LEVEL SELECTOR[SM] ANNUITY OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE RUSSELL 2000® INDEX OR ANY DATA INCLUDED THEREIN. RUSSELL MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE RUSSELL 2000®  INDEX OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL RUSSELL HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS), EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

[3] MetLife Shield Level Selector[SM] Annuity is not sponsored, endorsed, sold or promoted by The NASDAQ OMX Group, Inc. or its affiliates (NASDAQ OMX, with its affiliates, are referred to as the "Corporations").  The Corporations have not passed on the legality or suitability of, or the accuracy or adequacy of descriptions and disclosures relating to, the MetLife Shield Level Selector[SM] Annuity. The Corporations make no representation or warranty, express or implied to the owners of the MetLife Shield Level Selector[SM] Annuity or any member of the public regarding the advisability of investing in securities generally or in the MetLife Shield Level Selector[SM] Annuity particularly, or the ability of the NASDAQ-100 Index® to track general stock market performance.  The Corporations' only relationship to MetLife Insurance Company USA is in the licensing of the Nasdaq® OMX™, and NASDAQ-100 Index® registered trademarks, and certain trade names of the Corporations and the use of the NASDAQ-100 Index®  is determined, composed and calculated by NASDAQ OMX without regard to MetLife Insurance Company USA or the MetLife Shield Level Selector[SM] Annuity.  NASDAQ OMX has no obligation to take the needs of MetLife Insurance Company USA or the owners of the MetLife Shield Level Selector[SM] Annuity into consideration in determining, composing or calculating the NASDAQ-100 Index.[4] The Corporations are not responsible for and have not participated in the determination of the timing of, prices at, or quantities of the MetLife Shield Level Selector[SM] Annuity to be issued or in the determination or calculation of the equation by which the MetLife Shield Level Selector[SM] Annuity is to be converted into cash. The Corporations have no liability in connection with the administration, marketing or trading of the MetLife Shield Level Selector[SM] Annuity.

THE CORPORATIONS DO NOT GUARANTEE THE ACCURACY AND/OR UNINTERRUPTED CALCULATION OF THE NASDAQ-100 INDEX[4] OR ANY DATA INCLUDED THEREIN.  THE CORPORATIONS MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY METLIFE INSURANCE COMPANY USA, OWNERS OF THE METLIFE SHIELD LEVEL SELECTOR[SM] ANNUITY, OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE NASDAQ-100 INDEX® OR ANY DATA INCLUDED THEREIN. THE CORPORATIONS MAKE NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIM ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE NASDAQ-100 INDEX® OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL THE CORPORATIONS HAVE ANY LIABILITY

**FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES, EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.**

4 THE METLIFE SHIELD LEVEL SELECTOR$^{SM}$ ANNUITY IS NOT SPONSORED, ENDORSED, SOLD OR PROMOTED BY MSCI INC. ("MSCI"), ANY OF ITS AFFILIATES, ANY OF ITS INFORMATION PROVIDERS OR ANY OTHER THIRD PARTY INVOLVED IN, OR RELATED TO, COMPILING, COMPUTING OR CREATING ANY MSCI INDEX (COLLECTIVELY, THE "MSCI PARTIES").  THE MSCI INDEXES ARE THE EXCLUSIVE PROPERTY OF MSCI. MSCI AND THE MSCI INDEX NAMES ARE SERVICE MARK(S) OF MSCI OR ITS AFFILIATES AND HAVE BEEN LICENSED FOR USE FOR CERTAIN PURPOSES BY METLIFE INSURANCE COMPANY USA. NONE OF THE MSCI PARTIES MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, TO THE ISSUER OR OWNERS OF THIS PRODUCT OR ANY OTHER PERSON OR ENTITY REGARDING THE ADVISABILITY OF INVESTING IN PRODUCTS GENERALLY OR IN THIS PRODUCT PARTICULARLY OR THE ABILITY OF ANY MSCI INDEX TO TRACK CORRESPONDING STOCK MARKET PERFORMANCE. MSCI OR ITS AFFILIATES ARE THE LICENSORS OF CERTAIN TRADEMARKS, SERVICE MARKS AND TRADE NAMES AND OF THE MSCI INDEXES WHICH ARE DETERMINED, COMPOSED AND CALCULATED BY MSCI WITHOUT REGARD TO THIS PRODUCT OR THE ISSUER OR OWNERS OF THIS PRODUCT OR ANY OTHER PERSON OR ENTITY. NONE OF THE MSCI PARTIES HAS ANY OBLIGATION TO TAKE THE NEEDS OF THE ISSUER OR OWNERS OF THIS PRODUCT OR ANY OTHER PERSON OR ENTITY INTO CONSIDERATION IN DETERMINING, COMPOSING OR CALCULATING THE MSCI INDEXES.  NONE OF THE MSCI PARTIES IS RESPONSIBLE FOR OR HAS PARTICIPATED IN THE DETERMINATION OF THE TIMING OF, PRICES AT, OR QUANTITIES OF THIS PRODUCT TO BE ISSUED OR IN THE DETERMINATION OR CALCULATION OF THE EQUATION BY OR THE CONSIDERATION INTO WHICH THIS PRODUCT IS REDEEMABLE. FURTHER, NONE OF THE MSCI PARTIES HAS ANY OBLIGATION OR LIABILITY TO THE ISSUER OR OWNERS OF THIS PRODUCT OR ANY OTHER PERSON OR ENTITY IN CONNECTION WITH THE ADMINISTRATION, MARKETING OR OFFERING OF THIS PRODUCT.

ALTHOUGH MSCI SHALL OBTAIN INFORMATION FOR INCLUSION IN OR FOR USE IN THE CALCULATION OF THE MSCI INDEXES FROM SOURCES THAT MSCI CONSIDERS RELIABLE, NONE OF THE MSCI PARTIES WARRANTS OR GUARANTEES THE ORIGINALITY, ACCURACY AND/OR THE COMPLETENESS OF ANY MSCI INDEX OR ANY DATA INCLUDED THEREIN. NONE OF THE MSCI PARTIES MAKES ANY WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY THE ISSUER OF THE PRODUCT, OWNERS OF THE PRODUCT, OR ANY OTHER PERSON OR ENTITY, FROM THE USE OF ANY MSCI INDEX OR ANY DATA INCLUDED THEREIN. NONE OF THE MSCI PARTIES SHALL HAVE ANY LIABILITY FOR ANY ERRORS, OMISSIONS OR INTERRUPTIONS OF OR IN CONNECTION WITH ANY MSCI INDEX OR ANY DATA INCLUDED THEREIN. FURTHER, NONE OF THE MSCI PARTIES MAKES ANY EXPRESS OR IMPLIED WARRANTIES OF ANY KIND, AND THE MSCI PARTIES HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO EACH MSCI INDEX AND ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL ANY OF THE MSCI PARTIES HAVE ANY LIABILITY FOR ANY DIRECT, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR ANY OTHER DAMAGES (INCLUDING LOST PROFITS) EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

No purchaser, seller or holder of the MetLife Shield Level Selector$^{SM}$ Annuity, or any other person or entity, should use or refer to any MSCI trade name, trademark or service mark to sponsor, endorse, market or promote this security without first contacting MSCI to determine whether MSCI's permission is required.  Under no circumstances may any person or entity claim any affiliation with MSCI without the prior written permission of MSCI.

[5] "Bloomberg®", "Bloomberg Commodity Index" are service marks of Bloomberg L.P. ("Bloomberg") and have been licensed for use for certain purposes by MetLife Insurance Company USA.

The MetLife Shield Level Selector[SM] is not sponsored, endorsed, sold or promoted by Bloomberg, UBS AG, UBS Securities LLC ("UBS Securities") or any of their subsidiaries or affiliates.  None of Bloomberg, UBS AG, UBS Securities or any of their subsidiaries or affiliates makes any representation or warranty, express or implied, to the owners of or counterparties to the MetLife Shield Level Selector[SM] or any member of the public regarding the advisability of investing in securities or commodities generally or in the MetLife Shield Level Selector[SM] particularly. The only relationship of Bloomberg, UBS AG, UBS Securities or any of their subsidiaries or affiliates to the Licensee is the licensing of certain trademarks, trade names and service marks and of the Bloomberg Commodity Index[SM], which is determined, composed and calculated by Bloomberg in conjunction with UBS Securities without regard to MetLife Insurance Company USA or the MetLife Shield Level Selector[SM]. Bloomberg and UBS Securities have no obligation to take the needs of MetLife Insurance Company USA or the owners of the MetLife Shield Level Selector[SM] into consideration in determining, composing or calculating Bloomberg Commodity Index[SM]. None of Bloomberg, UBS AG, UBS Securities or any of their respective subsidiaries or affiliates is responsible for or has participated in the determination of the timing of, prices at, or quantities of the MetLife Shield Level Selector[SM] to be issued or in the determination or calculation of the equation by which the MetLife Shield Level Selector[SM] are to be converted into cash. None of Bloomberg, UBS AG, UBS Securities or any of their subsidiaries or affiliates shall have any obligation or liability, including, without limitation, to MetLife Shield Level Selector[SM] customers, in connection with the administration, marketing or trading of the MetLife Shield Level Selector[SM]. Notwithstanding the foregoing, UBS AG, UBS Securities and their respective subsidiaries and affiliates may independently issue and/or sponsor financial products unrelated to the MetLife Shield Level Selector[SM] currently being issued by Licensee, but which may be similar to and competitive with the MetLife Shield Level Selector[SM]. In addition, UBS AG, UBS Securities and their subsidiaries and affiliates actively trade commodities, commodity indexes and commodity futures (including the Bloomberg Commodity Index[SM]), as well as swaps, options and derivatives which are linked to the performance of such commodities, commodity indexes and commodity futures. It is possible that this trading activity will affect the value of the Bloomberg Commodity Index[SM] and MetLife Shield Level Selector[SM].

NONE OF BLOOMBERG, UBS AG, UBS SECURITIES OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES GUARANTEES THE ACCURACY AND/OR THE COMPLETENESS OF THE BLOOMBERG COMMODITY INDEX[SM] OR ANY DATA RELATED THERETO AND NONE OF BLOOMBERG, UBS AG, UBS SECURITIES OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES SHALL HAVE ANY LIABILITY FOR ANY ERRORS, OMISSIONS OR INTERRUPTIONS THEREIN. NONE OF BLOOMBERG, UBS AG, UBS SECURITIES OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES MAKES ANY WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY METLIFE INSURANCE COMPANY USA, OWNERS OF THE METLIFE SHIELD LEVEL SELECTOR[SM] OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE BLOOMBERG COMMODITY INDEX[SM] OR ANY DATA RELATED THERETO.  NONE OF BLOOMBERG, UBS AG, UBS SECURITIES OR ANY OF THEIR SUBSIDIARIES OR AFFILIATES MAKES ANY EXPRESS OR IMPLIED WARRANTIES AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE BLOOMBERG COMMODITY INDEX[SM] OR ANY DATA RELATED THERETO. WITHOUT LIMITING ANY OF THE FOREGOING, TO THE MAXIMUM EXTENT ALLOWED BY LAW, BLOOMBERG, ITS LICENSORS (INCLUDING UBS), AND ITS AND THEIR RESPECTIVE EMPLOYEES, CONTRACTORS, AGENTS, SUPPLIERS, AND VENDORS SHALL HAVE NO LIABILITY OR RESPONSIBILITY WHATSOEVER FOR ANY INJURY OR DAMAGES—WHETHER DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR OTHERWISE—ARISING IN CONNECTION WITH THE METLIFE SHIELD LEVEL SELECTOR[SM] OR BLOOMBERG COMMODITY INDEX[SM] OR ANY DATA OR VALUES RELATING THERETO—WHETHER ARISING FROM THEIR NEGLIGENCE OR OTHERWISE, EVEN IF NOTIFIED OF THE POSSIBILITY THEREOF. THERE ARE NO THIRD PARTY BENEFICIARIES OF ANY AGREEMENTS OR ARRANGEMENTS AMONG BLOOMBERG, UBS SECURITIES AND METLIFE INSURANCE COMPANY USA, OTHER THAN UBS AG.

L-22495 (09/12)

# DEFINITIONS

**Account Value**
Is the total of the value of the Shield Option(s) under this Contract, adjusted for any amounts that may be included by rider during the Accumulation Period.  Also referred to as "Contract Value."

**Accumulation Period**
The period prior to the Annuity Date.

**Annuity Service Office**
The office indicated on the Contract Schedule to which notices and requests must be sent, or as otherwise changed by notice from us.

**Annuitant**
The natural person listed on the Contract Schedule on whose life Income Payments are based. Any reference to Annuitant shall also include any Joint Annuitant under an Annuity Option.

**Annuity Date**
A date on which you choose to begin receiving Income Payments.  If we agree, you may change the Annuity Date subject to the requirements shown under the Annuity Option Information section on the Contract Schedule.  If you do not choose an Annuity Date, the Annuity Date will be the Annuity Date described on the Contract Schedule.  Also referred to as "Maturity Date."

**Attained Age**
The age of any Owner, Beneficiary or Annuitant on his/her last birthday.

**Beneficiary**
The person(s) or entity(ies) you name to receive a death benefit payable under this Contract upon the death of the Owner or a Joint Owner, or in certain circumstances, an Annuitant.

**Business Day**
Any day our Annuity Service Office, shown on the Contract Schedule, is open for business. For purposes of administrative requests and transactions, a Business Day ends at 4:00PM Eastern Standard Time.

**Code**
The Internal Revenue Code of 1986, as amended.

**Company**
MetLife Insurance Company USA.

**Contract Anniversary**
An anniversary of the Issue Date of this Contract.

**Contract Year**
A one-year period starting on the Issue Date and on each Contract Anniversary thereafter.

**Income Payments**
A series of payments made by us during an Income Period, which we guarantee as to dollar amount.

**Income Period**
A period starting on an Annuity Date during which Income Payments are payable.

**Investment Amount**
The Investment Amount for each Shield Option is the amount that is allocated to the Shield Option.  The Investment Amount will be reduced for any withdrawal by the same percentage that the withdrawal reduces the Interim Value attributable to that Shield Option. The Investment Amount is adjusted by the Performance Rate at the end of the Term.

**Issue Date**
The date this Contract was issued. The Issue Date is shown on the Contract Schedule.

**Joint Owner**
If there is more than one Owner, each Owner shall be a Joint Owner of the Contract.

**Notice**
Any form of communication providing information we need, either in a signed writing or another manner that we approve in advance. All Notices to us must be sent to our Annuity Service Office and received in good order. To be effective for a Business Day, a Notice must be received in good order prior to the end of that Business Day.

**Owner**
The person(s) entitled to the ownership rights under this Contract. If Joint Owners are named, all references to Owner shall mean Joint Owners. (Referred to as "you", "yours" or "policyholder.")

**Purchase Payment**
The amount paid to us under this Contract as consideration for the benefits it provides.

# GENERAL PROVISIONS

**The Contract**
The Contract consists of this contract and any attached riders or endorsements. We may require this Contract to be returned to us prior to the payment of any benefit. It is important to review any riders or endorsements. In case of conflict with any other provision of this Contract, the provisions of the Rider or Endorsement will control.

Notwithstanding any provision of this Contract to the contrary, this Contract will be construed and administered in accordance with applicable sections of the Code. To preserve this Contract's status as an annuity and comply with applicable sections of the Code and applicable Treasury Regulations, we may, if necessary amend this Contract. We will notify you of any amendments and, when required by law, we will obtain your approval and the approval of the appropriate regulatory authority.

**Non-Participating**
This Contract will not share in any distribution by us of Company dividends.

**Misstatement of Age or Sex**
We may require proof of the age or sex of the Annuitant, Owner and/or Beneficiary before making any payments under this Contract that are measured by the Annuitant's, Owner's or Beneficiary's life. If the age or sex of the Annuitant, Owner or Beneficiary has been misstated, the amount payable will be the amount that the Account Value would have provided at the correct age and sex.

Once Income Payments have begun, any underpayments will be made up in one sum with the next Income Payment or in any other manner agreed to by us. Any overpayments will be deducted first from future Income Payments. No interest will be credited or charged in the event of an underpayment or overpayment.

**Protection of Proceeds**
The Contract and payments under it will be exempt from the claims of creditors to the extent permitted by law.

**Reports**
At least once each calendar year we will furnish you with a report showing the Account Value and any other information as may be required by law. We will send you confirmations of certain transactions. Reports and confirmations will be sent to your last known address on our records. You will have 60 days from the date you receive your report or confirmation to inform us of any errors in the report or confirmation, otherwise the report or confirmation will be deemed to be final and correct.

**Premium and Other Taxes**
We reserve the right to deduct from the Purchase Payment or Account Value any taxes paid by us to any governmental entity relating to this Contract (including without limitation: premium taxes, federal, state and local withholding of income, estate, inheritance and other taxes required by law, and any new or increased state income taxes that may be enacted into law).

We may determine when taxes relate to the Contract, including for example when they have resulted from: receipt by us of the Purchase Payment; commencement of Income Payments, payment of death benefits; or partial and full withdrawals; and any new or increased taxes which become effective that are imposed on us and which relate to the Purchase Payment, or interest earnings.

We may pay taxes when due and make a deduction from the Account Value at a later date. Payment at an earlier date does not waive any right we may have to deduct amounts at a later date.

**Evidence of Survival**
We may require proof that any person(s) on whose life Income Payments are based is alive. We reserve the right to discontinue Income Payments until satisfactory proof is received.

**Modification of Contract**
This Contract may be changed by us in order to maintain compliance with applicable state and federal law. This Contract may be changed or altered only in writing signed by our President, Vice-President, or Secretary.

**Deferral of Payments**
After receipt of a Notice of withdrawal from you, we reserve the right to defer payment for a withdrawal for the period permitted by law but not for more than six (6) months.

**Suspension of Payments or Transfers**
We may be required to suspend or delay the payment of death benefits, the calculation of income payments, withdrawals, and transfers when we cannot obtain an Index Value under the following circumstances:

- the New York Stock Exchange is closed (other than customary weekend and holiday closings);

- trading on the New York Stock Exchange is restricted;

- an emergency exists such that we cannot value Investment Amounts; or

- during any other period when a regulator by order, so permits.

## ANNUITANT, OWNERSHIP, ASSIGNMENT PROVISIONS

**Owner**
You, as the Owner, have all the interest and rights under this Contract. The Owner is the person designated as such on the Issue Date, unless changed.

You may change the Owner at any time. Any change of Owner is subject to our underwriting requirements in effect at the time of the request.  A change of Owner will automatically revoke any prior designation of Owner. A request for change must be:

    1.   by Notice; and

    2.   received by us at the Annuity Service Office.

The change will become effective as of the date the Notice is signed by you. A new designation of Owner will not apply to any payment made or action taken by us prior to the time the new designation was recorded at our Annuity Service Office.

**Joint Owner**
A Contract may be owned by Joint Owners, limited to natural persons. Either Joint Owner can exercise all rights under the Contract unless you inform us otherwise as indicated on the Contract Schedule or in a Notice to us. Upon the death of either Owner, the surviving Joint Owner will be deemed to be the primary Beneficiary unless you inform us otherwise. Any other Beneficiary designation will be treated as a contingent Beneficiary unless otherwise indicated on the Contract Schedule or in a Notice to us.

**Annuitant**
The Annuitant is the person designated by you, the events in the life of whom are of primary importance in affecting the timing or amount of the payout under the contract. Unless the Contract is owned by a non-natural person, you may change the Annuitant at any time prior to an Annuity Date. Any change of Annuitant is subject to our underwriting rules in effect at the time of the request.

**Assignment**
This Contract may not be assigned without our consent in writing and is subject to our underwriting requirements.  You may not assign your rights under this Contract after the start of Income Payments. In certain tax markets assignment of this Contract is prohibited by the Internal Revenue Code.  If your contract is assigned absolutely, we will treat it as a change of ownership and all rights will be transferred.  We are not bound by any assignment request unless it is in writing.

We are not responsible for the validity of any assignment.  Assignments, unless otherwise specified by the Owner, shall take effect on the date notice of assignment is signed, subject to any payments made or actions taken by us before a signed copy of the assignment form is received by us at our Annuity Service Office.

## BENEFICIARY PROVISIONS

**Beneficiary**
The Beneficiary is the person(s) named on the Contract Schedule or the surviving Joint Owner, unless changed. Unless you provide otherwise, the death benefit will be paid to or in equal shares as follows:

1.  to the primary Beneficiary(ies) who survive you (or who survive the Annuitant if the Owner is a non-natural person); or if there are none, then

2.  to the contingent Beneficiary(ies) who survive you (or who survive the Annuitant if the Owner is a non-natural person); or if there are none, then

3.  to your estate.

**Change of Beneficiary**
Subject to the rights, including the written consent, of any irrevocable Beneficiary and any applicable laws or regulations, you may change the primary Beneficiary or contingent Beneficiary. A change may be made by filing a Notice with us. The change will take effect as of the date the Notice is signed, but we will not be liable for any payment made or action taken before we have recorded the change.

## PURCHASE PAYMENT PROVISIONS

**Separate Account**
The Purchase Payment made to this Contract is invested in the Separate Account shown on the Contract Schedule. We have exclusive and absolute ownership and control of the assets of the Separate Account. It is a non-unitized separate account. You do not share in the investment performance of assets allocated to the Separate Account.  All investment income, gains and losses, whether or not realized, from assets allocated to the Separate Account are borne by the Company.  The obligations under this Contract are independent of the investment performance of the Separate Account and are the obligations of the Company.

We will maintain in the Separate Account assets with an aggregate value at least equal to the Contract reserves.

If the aggregate value of such assets should fall below such amount, the Company will transfer assets into the Separate Account so that the value of the Separate Account's assets is at least equal to such amount.  Assets supporting reserves for annuity benefits under such contracts, in the course of payment, shall not be maintained in the Separate Account.

**Shield Options**
On the Issue Date, you may allocate your Purchase Payment to one or more of the available Shield Options listed on the Contract Schedule.   At the end of each Term, you may transfer the Account Value attributable to the Shield Option(s) to one or more of the available Shield Options subject to the Transfer Requirements shown on the Contract Schedule and the Renewal Provisions.

Each Shield Option has an associated Index, Term, Shield Rate, and either a Cap Rate or a Step Rate as defined below.

**Term**
The initial Term(s) begin on the Issue Date.  A Term ends and a subsequent Term begins, on the Contract Anniversary coinciding with the term duration of the then current Term for that Shield Option.

**Index**
There is a specific Index associated with each Shield Option.  The Index is the price index of certain securities, excluding dividends, or commodities.

**Index Value**
The Index Value of an Index, on a Business Day, is the published closing value of the Index on that Business Day.  We will use consistent sources to obtain Index Values.  If these sources are no longer available for specific indices, we will select an alternative published source(s) for these Index Values.  The Index Value on any day that is not a Business Day is the value as of the prior Business Day.

**Index Performance**
Index Performance is the percentage change in an Index Value measured from the beginning of a Term to any day, including the last day, within the Term. Index Performance can be positive, negative, or zero.

**Shield Rate**
The Shield Rate is the amount of any negative Index Performance that is absorbed by us at the end of the Term. Any negative Index Performance beyond the Shield Rate will reduce the Investment Amount. For example, a -15% Index Performance with a 10% Shield Rate will result in a -5% Performance Rate; or, a -10% Index Performance with a 25% Shield Rate will result in a 0% Performance Rate.

The Shield Rate may vary between Shield Options, and it is not an annual rate.

**Cap Rate**
The Cap Rate is the maximum rate that may be credited at the end of a Term based on Index Performance. A new Cap Rate is declared for each subsequent Term, and such rate will not be less than the Minimum Guaranteed Cap Rate on the Contract Schedule.

The Cap Rate may vary between Shield Options, and it is not an annual rate.

**Step Rate**
The Step Rate is the rate credited at the end of a Term if the Index Performance is greater than or equal to zero. A new Step Rate is declared for each subsequent Term, and such rate will not be less than the Minimum Guaranteed Step Rate on the Contract Schedule.

The Step Rate may vary between Shield Options, and it is not an annual rate.

## RENEWAL PROVISIONS

For renewals into the same Shield Option, a new Cap Rate or Step Rate, whichever is applicable, will be declared and will go into effect on the Contract Anniversary that coincides with the beginning of the new Shield Option.

**Discontinuation or Substantial Change to an Index**
If any Index is discontinued or, we determine that our use of such Index should be discontinued, or if the calculation of an Index is substantially changed, we may substitute a comparable index. We will send you a notice in writing before any such substitution is made. Upon substitution of an Index, we will calculate your Index Performance on the existing Index up until the date of substitution and the new Index from the date of substitution to the end of the Term. A substitute Index will not change the Shield Rate, Cap Rate or Step Rate for an existing Shield Option.

**Addition or Discontinuance of a Shield Option**
We can add or discontinue any Shield Option. When a change is made to the Shield Options or Indices referenced on the Contract Schedule or as changed subsequent to the Issue Date, we will send notification to you which will describe any changes to the Shield Options then available under the Contract as required by law. This change will take effect upon your Contract as of the next Contract Anniversary for any allowable transfers into the Shield Option(s). If you are currently invested in a Shield Option which is no longer available, you will remain in that Shield Option until the end of the Term, but that Shield Option will not be available thereafter.

## ACCOUNT VALUE PROVISIONS

The Account Value attributable to each Shield Option is as determined below and will be the Interim Value on any day during the Term and the Investment Amount as adjusted for the Performance Rate at the end of the Term as defined below subject to any fees as outlined in the Contract Schedule or via any riders or endorsements.

**Charges and Fees**
We will deduct charges and fees from your Account Value as described on the Contract Schedule (or any applicable riders or endorsements).

**Performance Rate**
The Performance Rate is the rate credited at the end of the Term. The Performance Rate at the end of a particular Term is the Index Performance, adjusted for the applicable Shield Rate, Cap Rate, or Step Rate. The Performance Rate can be positive, negative, or equal to zero. At the end of the Term, any increase or reduction in a particular Shield Option is

determined by multiplying the Performance Rate by the Investment Amount of the Shield Option on the last day of the Term.

The Performance Rate is determined as follows:

*Shield 100 Option with a Cap Rate:*

If Index Performance is equal to or less than zero, then the Performance Rate will be zero.

If Index Performance is greater than zero and less than the Cap Rate, then the Performance Rate will equal the Index Performance.

If the Index Performance is greater than zero and equals or exceeds the Cap Rate, then the Performance Rate will equal the Cap Rate.

*Shield 100 Option with a Step Rate:*

If Index Performance is less than zero then the Performance Rate will equal zero.

If Index Performance is equal to or greater than zero, the Performance Rate will equal the Step Rate.

*Other Shield Options with a Cap Rate:*

If Index Performance is equal to or less than zero, then the Performance Rate will equal the lesser of zero, or the Index Performance increased by the Shield Rate. (For example: a -15% Index Performance with a 10% Shield Rate will result in a -5% Performance Rate.) The Performance Rate can never be greater than zero if the Index Performance is negative.

If Index Performance is greater than zero and less than the Cap Rate, then the Performance Rate will equal the Index Performance.

If Index Performance is greater than zero and equals or exceeds the Cap Rate, then the Performance Rate will equal the Cap Rate.

*Other Shield Options with a Step Rate:*

If Index Performance is less than zero, then the Performance Rate will equal the lesser of zero or the Index Performance increased by the Shield Rate. (For example: a -15%Index Performance with a 10% Shield Rate will result in a -5% Performance Rate.) The Performance Rate can never be greater than zero if the Index Performance is negative.

If Index Performance is equal to or greater than zero, the Performance Rate will equal the Step Rate.

**Interim Value**
The Interim Value for each Shield Option is the value we assign on any Business Day prior to the end of the Term. During the Transfer Period set forth in the Contract Schedule, the Interim Value of each Shield Option will equal the Investment Amount in that Shield Option. After the Transfer Period, the Interim Value of that Shield Option is equal to the Investment Amount in the Shield Option, adjusted for the Index Performance of the associated Index and subject to the applicable Accrued Shield Rate, Accrued Cap Rate, or Accrued Step Rate, as defined below.

On the date of a withdrawal from the Shield Option(s), your Interim Value will be reduced by the amount withdrawn.

**Accrued Shield Rate**
The Accrued Shield Rate is the portion of the Shield Rate that has accrued from the beginning of a Term to any day within the Term. This is the amount that will be applied in calculating the Interim Value on any day prior to the end of the Term if Index Performance is less than zero. The Accrued Shield Rate is equal to the Shield Rate multiplied by the number of days elapsed since the beginning of the Term, divided by the total number of days in the Term.

**Accrued Cap Rate**
The Accrued Cap Rate is the portion of the Cap Rate that has accrued from the beginning of a Term to any day within the Term. This is the maximum Index Performance that may be applied in calculating the Interim Value on any day prior to the end of the Term if Index Performance is greater than zero. The Accrued Cap Rate is equal to the Cap Rate multiplied by the number of days elapsed since the beginning of the Term, divided by the total number of days in the Term.

**Accrued Step Rate**
The Accrued Step Rate is the portion of the Step Rate that has accrued from the beginning of a Term to any day within the Term. This is the rate that will be applied in calculating the Interim Value on any day prior to the end of the Term if Index Performance is equal to or greater than zero. The Accrued Step Rate is equal to the Step Rate multiplied by the number of days elapsed since the beginning of the Term divided by the total number of days in the Term.

**Performance Rate for Determination of Interim Value**
Except as indicated on the Contract Schedule, the Performance Rate during a particular Term is the Index Performance, adjusted for the applicable Accrued Shield Rate, Accrued Cap Rate, or Accrued Step Rate.

For purposes of determining the Accrued Shield Rate, Accrued Cap Rate, and Accrued Step Rate, the total number of days in each calendar year of a Term is 365.

The following are hypothetical examples that show the determination of the Interim Value when the Index Performance is greater than zero and less than zero.  These hypothetical examples are rounded for illustrative purposes:

**Example #1 – Index Performance is positive – Interim Value calculated 306 days into a Term of 3 Years.**

| | |
|---|---|
| Issue Date | March 1, 2013 |
| Investment Amount | $100,000 |
| Shield Option | XYZ 10 |
| Term | 3 Years |
| Shield Rate | 10% |
| Cap Rate | 25% |
| Index Value at Beginning of Term | 1000 |
| Number of Days in Term | 1095  (3 X 365 = 1095) |
| Index Value at close of Business Day on January 1, 2014 | 1100 |
| Index Performance | 10% |
| Accrued Days | 306 |

The Accrued Cap Rate as of January 1, 2014 is 6.986% 306 days into the 3 year term (25%*(306/1095)).  The Index Performance is calculated at 10% (1100/1000 - 1).  Since the Index Performance is positive, the Interim Value is then determined by multiplying the Investment Amount by the lesser of the Index Performance or the Accrued Cap Rate and adding that amount to the Investment Amount.  As of the close of the Business Day January 1, 2014, the Interim Value is $106,986 ($100,000+$100,000 * 6.986%).

**Example #2 – Index Performance is negative– Interim Value calculated 306 days into a Term of 3 Years.**

| | |
|---|---|
| Issue Date | March 1, 2013 |
| Investment Amount | $100,000 |
| Shield Option | XYZ 10 |
| Term | 3 Years |
| Shield Rate | 10% |
| Cap Rate | 25% |
| Index Value at Beginning of Term | 1000 |
| Number of Days in Term | 1095  (3 X 365 = 1095) |
| Index Value at close of Business Day on January 1, 2014 | 950 |
| Index Performance | -5% |
| Accrued Days | 306 |

The Accrued Shield Rate as of January 1, 2014 is 2.795% 306 days into the 3 year term (10% * (306/1095)).  The Index Performance is calculated at -5% (950/1000 - 1).  Since the Index Performance is negative, the Interim Value is then determined by multiplying the Investment Amount by the Index Performance plus the Accrued Shield Rate (-5% + 2.795% = -2.205%) and adding that amount to the Investment Amount.  As of the close of Business Day January 1, 2014, the Interim Value is $97,795 ($100,000+$100,000*-2.205%).

L-22494 (09/12)                                               10

# WITHDRAWAL PROVISIONS

**Withdrawals**
Prior to the Annuity Date, you may, upon Notice to us, request a full or a partial withdrawal and we will withdraw that amount from the Account Value ("the amount withdrawn"). A withdrawal will result in a reduction to each Shield Option in the ratio that each Shield Option bears to the total Account Value, as determined under the Account Value Provisions above, unless otherwise directed by you. The amount payable to you will be a net amount equal to the amount withdrawn adjusted for any applicable Withdrawal Charge and any other fees shown on the Contract Schedule, Premium and Other Taxes, and any other rider and endorsement fees.

The total amount withdrawn from the Account Value must not be less than the Minimum Partial Withdrawal amount shown on the Contract Schedule. If the withdrawal would result in the remaining Account Value being less than the Minimum Account Value shown on the Contract Schedule, we will treat the withdrawal request as a request for a full withdrawal.

If you request a full or partial withdrawal, the amount withdrawn after adjustments for any Withdrawal Charge will result in our paying you a net amount. The net amount payable to you is equal to (a)-(b)-(c)-(d), where:

   (a)   is the amount withdrawn from the Account Value, and

   (b)   is the Withdrawal Charge and other fees, if any, as described on the Contract Schedule, and

   (c)   is the Premium and Other Taxes, if any, and

   (d)   is the rider and endorsement fees, if any.

The amount withdrawn will reduce the Investment Amount, as defined in the Definitions section, for each Shield Option by the percentage reduction in the Interim Value of such Shield Option.

# DEATH BENEFIT PROVISIONS

**Death of Owner During the Accumulation Period**
During the Accumulation Period, the death benefit will be paid to your Beneficiary(ies) upon your death, or the first death of a Joint Owner. If the Contract is owned by a non-natural person, the Annuitant will be deemed the Owner for purposes of determining the death benefit. If there are Joint Owners, the age of the oldest will be used to determine the death benefit where applicable.

**Death Benefit Amount During the Accumulation Period**
The "Death Benefit Amount" is the Account Value, as defined under the Account Value Provisions above, determined as of the end of the Business Day on which we have received Notice of both due proof of death and the first acceptable election for the payment method.

**Death Benefit Options During the Accumulation Period**
In the event an Owner (or the Annuitant where the Owner is not an individual) dies during the Accumulation Period, a Beneficiary must choose payment of the death benefit under one of the options below (unless the Owner has previously chosen an option). The death benefit options available under the Contract include the following and any other options acceptable to you and us:

**Option 1** - lump sum payment of the death benefit; or

**Option 2** - the payment of the entire death benefit within five years of the date of death of the Owner or the first Joint Owner to die; or

**Option 3** - payment of the death benefit under an Annuity Option or other periodic payment option acceptable to us in substantially equal periodic payments (made at least annually) over the lifetime of the Beneficiary or over a period not extending beyond the life expectancy of the Beneficiary with distribution beginning within one year of the date of death of the Owner or the first Joint Owner to die.

Any portion of the death benefit not applied under Option 3 within one (1) year of the date of the Owner's or Joint Owner's death must be distributed within five years of the date of death.

**Beneficiary Continuation Options During Accumulation Period**
We offer two types of Beneficiary Continuation Options during the Accumulation Period: the Spousal Continuation and Non-Spousal Beneficiary Continuation Options described below. We must receive Notice of the election of one of these Beneficiary Continuation Options by the end of the 90th day after we receive Notice of due proof of death. If the surviving

spouse qualifies for Spousal Continuation and has not chosen one of the death benefit options above by the end of the 90 day period, the Spousal Continuation Option will be automatically applied on the 90th day. If a Non-Spousal Beneficiary qualifies for Non-Spousal Beneficiary Continuation and has not chosen one of the death benefit options above by the end of the 90 day period, the Non-Spousal Beneficiary Continuation Option will be automatically applied on the 90th day.

**Spousal Continuation During Accumulation Period**
If the Owner dies during the Accumulation Period and the Beneficiary is his or her spouse, the spouse may choose to continue the Contract in his or her own name and exercise all the Owner's rights under the Contract. The Death Benefit Amount under the continued contract payable upon the continuing spouse's death will be computed as described above in the Death Benefit Amount During the Accumulation Period section.

**Non-Spousal Beneficiary Continuation During Accumulation Period**
A Beneficiary who is not a spouse can choose to continue the Contract until the fifth anniversary of the Owner's death. The Contract can be continued by a Beneficiary only if his or her share of the death benefit is at least equal to our published minimum for this right. If the Beneficiary continues the Contract under this provision his or her share will not be paid. It will instead be continued in the Contract on the date we determine the Death Benefit Amount.  Such Beneficiary will have the right to make partial and full withdrawals of his/her share of the Contract, not subject to Withdrawal Charges. Such Beneficiary will also have the right to make transfers at the end of a Term as described on the Contract Schedule.

During the continuation period the Beneficiary can choose to receive his/her share of this Contract in a single lump sum payment or apply it to an Annuity Option or other option acceptable to us that must be payable for the life of the Beneficiary or for a term no longer than the life expectancy of the Beneficiary starting within one year after the death of the Owner.

On the fifth anniversary of the Owner's death any Beneficiary will be paid his/her share of the Account Value that has not been applied to an Annuity option or other settlement option permissible under the Code, in a single lump sum payment and this Contract will terminate.

**Death of Annuitant During Income Period**
Upon the death of the Annuitant during the Income Period, the death benefit, if any, will be as specified in the Annuity Option chosen. Death benefits will be paid at least as rapidly as under the method of distribution in effect at the Annuitant's death.

**Death of Owner During the Income Period**
If the Owner (or a Joint Owner), is not the Annuitant, and dies during the Income Period, any remaining payments under the Annuity Option will continue at least as rapidly as under the method of distribution in effect at the time of the Owner's (or Joint Owner's) death. Upon the death of the Owner (or a Joint Owner) during the Income Period, the Beneficiary becomes entitled to exercise the rights of the Owner.  If an Owner (or Joint Owner) is the Annuitant and dies during the Income Period, the death benefit, if any, will be as specified in the Annuity Option chosen and will continue at least as rapidly as under the method of distribution in effect at the time of the Owner's (or Joint Owner's) death.

**Death of Annuitant During Accumulation Period**
Upon the death of an Annuitant, who is not the Owner or Joint Owner, during the Accumulation Period, the Owner (or Oldest Joint Owner) automatically becomes the Annuitant, unless the Owner, subject to our underwriting rules in effect at the time of request, chooses a new Annuitant.  If the Owner is a non-natural person, the death of the Annuitant will be treated as the death of an Owner (see Death of Owner During the Accumulation Period discussed above).

**Payment of Death Benefit**
We will require Notice of both due proof of death and an acceptable election for the payment method before any death benefit is paid. Our obligations are subject to all payments made and actions taken by us before our receipt of Notice of due proof of death.

Any death benefit will be paid in accordance with applicable law or regulations governing death benefit payments.

## ANNUITY PROVISIONS

**Election of Annuity Option**
The Annuity Option is chosen by you or your Beneficiary in a form satisfactory to us. We will automatically send you information about Annuity Options before your Annuity Date. If you do not choose an Annuity Option, make a full withdrawal by the Annuity Date, or ask us to continue the Contract by the Annuity Date, we will automatically pay you under Option 2: Life Annuity with Ten (10) Years of Income Payments Guaranteed. You can make, change, or revoke

your Annuity Option choice before the death benefit becomes payable or the Annuity Date, whichever occurs first.

**Annuity Options**
You may choose to receive Income Payments monthly, quarterly, semi-annually or annually. The following Annuity Options, or any other options acceptable to you and us, may be chosen:

**Option 1:  Life Annuity**

Income Payments that are paid as long as the Annuitant is living.

**Option 2:  Life Annuity with 10 Years of Income Payments Guaranteed**

Income Payments that continue as long as the Annuitant is living but are guaranteed to be paid for ten years.

**Option 3:  Joint and Last Survivor Life Annuity**

Income Payments that are paid as long as either of two Annuitants is living.

**Option 4:  Joint and Last Survivor Annuity with 10 Years of Income Payments Guaranteed**

Income Payments that continue as long as either of the two Annuitants are living but are guaranteed to be paid for ten years.

If, as of the Annuity Date, the then current Annuity rates applicable to this class of contracts provide an Income Payment greater than the one guaranteed under this Contract for the same Annuity Option, then the greater payment will be made.

**Income Payments**
Income Payments are based upon the Annuity Option chosen, the Account Value, as defined under the Account Value Provisions above, applied to the Annuity Option, the Annuitant's Attained Age and sex, and the appropriate Fixed Annuity Table. These payments will be reduced by any applicable charges and fees as described in the Contract Schedule.

**Frequency and Amount of Income Payments**
Income Payments will be paid as monthly installments or at any frequency acceptable to you and us. If the amount of the Account Value to be applied under an Annuity Option is less than $5,000, we reserve the right to make one lump sum payment equal to the then current Account Value in lieu of Income Payments. If the amount of the Income Payment would be less than $100, we may reduce the frequency of payments to an interval which will result in the payment being at least $100, but with a frequency of no less than annually.

**Basis of Payments**
The Annuity Tables are based on the tables defined under the Annuity Option Information described in the Contract Schedule. The amount of each Income Payment is guaranteed by us.

## FIXED ANNUITY TABLES

## AMOUNT OF MONTHLY INCOME PAYMENT

### PER $1000 OF Account Value

Annuitant Only

**Option 1: Life Annuity**

| Attained Age of Annuitant | Male | Female |
|---|---|---|
| 55 | 2.74 | 2.59 |
| 60 | 3.07 | 2.89 |
| 65 | 3.50 | 3.27 |
| 70 | 4.07 | 3.77 |
| 75 | 4.84 | 4.45 |
| 80 | 5.93 | 5.42 |
| 85 | 7.50 | 6.86 |

**Option 2: Life Annuity with 10 Years of Income Payments Guaranteed**

| Attained Age of Annuitant | Male | Female |
|---|---|---|
| 55 | 2.73 | 2.59 |
| 60 | 3.05 | 2.88 |
| 65 | 3.46 | 3.24 |
| 70 | 3.99 | 3.72 |
| 75 | 4.66 | 4.34 |
| 80 | 5.50 | 5.16 |
| 85 | 6.45 | 6.16 |

**Option 3: Joint and Last Survivor Life Annuity**

|  | Age of Female Annuitant | | | | |
|---|---|---|---|---|---|
| Attained age of Male Annuitant | 10 Years Younger | 5 Years Younger | Same Age | 5 Years Older | 10 Years Older |
| 55 | 2.09 | 2.21 | 2.34 | 2.45 | 2.54 |
| 60 | 2.26 | 2.42 | 2.57 | 2.71 | 2.82 |
| 65 | 2.48 | 2.67 | 2.86 | 3.04 | 3.19 |
| 70 | 2.75 | 3.00 | 3.25 | 3.49 | 3.69 |
| 75 | 3.10 | 3.42 | 3.77 | 4.09 | 4.37 |
| 80 | 3.55 | 4.00 | 4.48 | 4.95 | 5.33 |
| 85 | 4.18 | 4.82 | 5.51 | 6.17 | 6.69 |

**Option 4: Joint and Last Survivor Annuity with 10 Years of Income Payments Guaranteed**

|  | Age of Female Annuitant | | | | |
|---|---|---|---|---|---|
| Attained age of Male Annuitant | 10 Years Younger | 5 Years Younger | Same Age | 5 Years Older | 10 Years Older |
| 55 | 2.09 | 2.21 | 2.34 | 2.45 | 2.54 |
| 60 | 2.26 | 2.42 | 2.57 | 2.71 | 2.82 |
| 65 | 2.48 | 2.67 | 2.86 | 3.04 | 3.19 |
| 70 | 2.75 | 2.99 | 3.25 | 3.48 | 3.68 |
| 75 | 3.09 | 3.42 | 3.76 | 4.08 | 4.34 |
| 80 | 3.55 | 3.99 | 4.45 | 4.88 | 5.19 |
| 85 | 4.15 | 4.76 | 5.38 | 5.89 | 6.22 |

Monthly installments for ages not shown will be furnished on request.

THIS PAGE LEFT INTENTIONALLY BLANK

# METLIFE INSURANCE COMPANY USA
1209 Orange Street
Wilmington, DE  19801

# FIXED ACCOUNT RIDER

This Rider is part of the Contract to which it is attached and is effective upon issuance. In the case of a conflict with any provision of the Contract, the provisions of this Rider will control. This Rider amends the Contract as follows:

## 1.   DEFINITIONS

The following replaces the definition of "Account Value" in the "Definitions" section:

**Account Value**
Is the total of the Fixed Account Value and the value of the Shield Option(s) under this Contract, adjusted for any amounts that may be included by rider during the Accumulation Period.  Also referred to as "Contract Value."

## 2.   FIXED ACCOUNT - The following is added to the Contract:

### FIXED ACCOUNT PROVISIONS

**Fixed Account**
We credit interest to the portion of the Account Value allocated to the Fixed Account.  The Fixed Account is part of our General Account.  We guarantee that the interest credited to your initial allocation to the Fixed Account during the Interest Rate Term beginning on the Issue Date will not be less than the Minimum Guaranteed Interest Rate shown on the Contract Schedule.  Thereafter, we will declare an interest rate as of each Contract Anniversary for the duration of the Interest Rate Term and such rate will not be less than the Minimum Guaranteed Interest Rate.  If the declared interest rate equals the Minimum Guaranteed Interest Rate, we reserve the right to restrict transfers and allocations into the Fixed Account.

The initial Fixed Account Value is the amount initially allocated to the Fixed Account.  Thereafter, the Fixed Account Value equals: (a) the initial Fixed Account Value or the Fixed Account Value on the most recent Contract Anniversary, whichever is applicable, including any transfers; plus (b) any interest credited by us; less (c) the amount of any withdrawals including any Withdrawal Charges; less (d) any Premium or Other Taxes, if applicable; and less (e) any other fees shown on the Contract Schedule or associated with riders and endorsements, if applicable.

**Interest Crediting Method**
Interest will be compounded and credited to the Fixed Account at an annual effective interest rate declared by Us.  Interest will be credited on amounts allocated to the Fixed Account through the effective date such amounts are withdrawn or transferred from the Fixed Account.

**Interest Rate Term**
The Interest Rate Term is the length of time over which the current interest rate is guaranteed.  At the end of the Interest Rate Term, the Fixed Account Value will automatically be renewed into the same Interest Rate Term unless otherwise directed by You.  No Interest Rate Term will extend beyond the Annuity Date.

## 3.   PURCHASE PAYMENT PROVISIONS -- Replace the first paragraph of the section entitled "Shield Options" with the following:

**Shield Options**
On the Issue Date, you may allocate your Purchase Payment to one or more of the available Shield Options listed on the Contract Schedule and the Fixed Account.   At the end of each Term or Interest Rate Term, you may transfer the Account Value  attributable to the Shield Option(s) or the  Fixed Account to one or more of the available Shield Options  or  the Fixed Account (if available) subject to the Transfer Requirements shown on the Contract Schedule and the Renewal Provisions.

## 4.   WITHDRAWAL PROVISIONS – The following will replace the section entitled "Withdrawals" under "Withdrawal Provisions" with the following:

Prior to the Annuity Date, you may, upon Notice to us, request a full or a partial withdrawal and we will withdraw that amount from the Account Value ("the amount withdrawn").  A withdrawal will result in a reduction to each Shield Option and the Fixed Account in the ratio that each Shield Option and the Fixed Account bears to the total Account

L-22496 (09/12)

Value, as determined under the Account Value Provisions above, unless otherwise directed by you.  The amount payable to you will be a net amount equal to the amount withdrawn adjusted for any applicable Withdrawal Charge and any other fees shown on the Contract Schedule, Premium and Other Taxes, and any other rider and endorsement fees.

The total amount withdrawn from the Account Value must not be less than the Minimum Partial Withdrawal amount shown on the Contract Schedule.  If the withdrawal would result in the remaining Account Value being less than the Minimum Account Value shown on the Contract Schedule, we will treat the withdrawal request as a request for a full withdrawal.

If you request a full or partial withdrawal, the amount withdrawn after adjustments for any Withdrawal Charge will result in our paying you a net amount. The net amount payable to you is equal to (a)-(b)-(c)-(d), where:

(a)     is the amount withdrawn from the Account Value, and

(b)     is the Withdrawal Charge and other fees, if any, as described on the Contract Schedule, and

(c)     is the Premium and Other Taxes, if any, and

(d)     is the rider and endorsement fees, if any.

The amount withdrawn will reduce the Investment Amount, as defined in the Definitions section, for each Shield Option by the percentage reduction in the Interim Value of such Shield Option and the Fixed Account Value as applicable.

5.   **DEATH BENEFIT PROVISIONS** – The following will replace the first paragraph of the section entitled "Non-Spousal Beneficiary Continuation During Accumulation Period" under "Death Benefit Provisions" with the following:

A Beneficiary who is not a spouse can choose to continue the Contract until the fifth anniversary of the Owner's death. The Contract can be continued by a Beneficiary only if his or her share of the death benefit is at least equal to our published minimum for this right.  If the Beneficiary continues the Contract under this provision his or her share will not be paid. It will instead be continued in the Contract on the date we determine the Death Benefit Amount. Such Beneficiary will have the right to make partial and full withdrawals of his/her share of the Contract, not subject to Withdrawal Charges.  Such Beneficiary will also have the right to make transfers at the end of a Term or Interest Rate Term as described on the Contract Schedule.

MetLife Insurance Company USA has caused this Rider to be signed by its Secretary.

**Secretary**

# METLIFE INSURANCE COMPANY USA
1209 Orange Street
Wilmington, DE  19801

# WAIVER OF WITHDRAWAL CHARGE FOR NURSING HOME OR HOSPITAL CONFINEMENT RIDER

This Rider forms a part of the Contract to which it is attached and is effective as of the Issue Date. In the case of a conflict with any provision in the Contract, the provisions of this Rider will control. This Rider is irrevocable and its provisions will remain part of the Contract until the earlier of the Annuity Date or the date the Contract terminates.  This Rider amends the Contract as follows:

The following provisions are added to the Contract:

## WAIVER OF WITHDRAWAL CHARGE FOR NURSING HOME OR HOSPITAL CONFINEMENT

After the first Contract Anniversary, the Withdrawal Charge attributable to such withdrawal will be waived upon a withdrawal if:

1. you are confined to a Nursing Home and/or Hospital for at least 90 consecutive days or confined for a total of at least 90 days if there is no more than a 6-month break in the confinement and the confinements are for related causes;

2. the first confinement referred to in (1) above begins on or after the first Contract Anniversary;

3. the withdrawal request and proof satisfactory to us of confinement are received by us at our Annuity Service Office either while you are confined or within 90 days after such confinement;

4. confinement in a Nursing Home and/or Hospital is prescribed by a Physician and is Medically Necessary; and

5. you have been the Owner continuously since the Issue Date, or you are a Spousal Beneficiary who continues the Contract under the Spousal Continuation During Accumulation Period Option.

In the case of Joint Owners, this Rider applies to either Joint Owner. If the Owner is not a natural person, this Rider applies to the Annuitant provided the Annuitant has continuously been the Annuitant since the Issue Date.

## DEFINITIONS

**Hospital -** A facility which:

1. is located in the United States or its territories;

2. is licensed as a hospital by the jurisdiction in which it is located;

3. is supervised by a staff of licensed physicians;

4. provides nursing services 24 hours a day by, or under the supervision of, a registered nurse (R.N.);

5. operates primarily for the care and treatment of sick and injured persons as inpatients for a charge; and

6. has access to medical and diagnostic facilities.

**Intermediate Care Facility** - A facility which:

1. is located in the United States;

2. is licensed and operated as an Intermediate Care Facility according to the laws of the jurisdiction in which it is located;

3. provides continuous 24 hours a day nursing service by, or under the supervision of, a registered graduate professional nurse (R.N.) or a licensed practical nurse (L.P.N.); and

4. maintains a daily medical record of each patient.

**Medically Necessary -** Appropriate and consistent with the diagnosis in accord with accepted standards of practice and which could not have been omitted without affecting the individual's condition.

L-25005 (09/12)

**Nursing Home -** A facility which is a Skilled Nursing Facility, an Intermediate Care Facility or Residential Care Facility. Nursing Home does not mean:

1.  a home for the aged, a community living center or place that primarily provides domiciliary, residency or retirement care; or

2.  a place owned or operated by a member of the Owner's immediate family. Immediate family members include the Owner's spouse, children, parents, grandparents, grandchildren, siblings and in-laws.

**Physician -** Any person duly licensed and legally qualified to diagnose and treat sickness and injuries. A physician must be providing services within the scope of his or her license. A Physician may not be a member of the Owner's immediate family.

**Residential Care Facility -** A facility which:

1.  is located in the United States or its territories;

2.  is licensed and operated as a Residential Care Facility according to the laws of the jurisdiction in which it is located; and

3.  provides nursing care under the supervision of a registered professional nurse (R.N.).

**Skilled Nursing Facility -** A facility which:

1.  is located in the United States or its territories;

2.  is licensed and operated as a Skilled Nursing Facility according to the laws of the jurisdiction in which it is located;

3.  provides skilled nursing care under the supervision of a licensed physician;

4.  provides continuous 24 hours a day nursing services by, or under the supervision of, a registered graduate professional nurse (R.N.); and

5.  maintains a daily medical record of each patient.

MetLife Insurance Company USA has caused this Rider to be signed by its Secretary.

**Secretary**

# METLIFE INSURANCE COMPANY USA
1209 Orange Street
Wilmington, DE  19801

## WAIVER OF WITHDRAWAL CHARGE FOR TERMINAL ILLNESS RIDER

This Rider forms a part of the Contract to which it is attached and is effective as of the Issue Date. In the case of a conflict with any provision in the Contract, the provisions of this Rider will control.

After the first Contract Anniversary, the Withdrawal Charge will be waived upon a withdrawal if:

1.  you are terminally ill and not expected to live more than 12 months;

2.  a Qualified Physician certifies to your illness and life expectancy;

3.  you were not diagnosed with the terminal illness as of the Issue Date; and

4.  you have been the Owner continuously since the Issue Date or have become the Owner as spousal Beneficiary who continues the Contract.

In the case of Joint Owners, this Rider applies to either Joint Owner. If the Owner is not a natural person, this Rider applies to the Annuitant.

Qualified Physician is any person duly licensed and legally qualified to diagnose and treat sickness and injuries. A physician must be providing services within the scope of his or her license. A Physician may not be a member of the Owner's immediate family. Immediate family members include the Owner's spouse, children, parents, grandparents, grandchildren, siblings and in-laws.

This Rider will terminate on the Annuity Date.

MetLife Insurance Company USA has caused this Rider to be signed by its Secretary.

*Jacob Gunkelowitz*

**Secretary**

THIS PAGE LEFT INTENTIONALLY BLANK

# METLIFE INSURANCE COMPANY USA
1209 Orange Street
Wilmington, DE  19801

# INDIVIDUAL NON-QUALIFIED ANNUITY ENDORSEMENT

This Endorsement forms a part of the Contract or Certificate to which it is attached (the "Contract").  This Endorsement is being added to the Contract as of its issue date in order to clarify the Contract provisions that help maintain the Contract's tax qualification as an annuity contract for federal tax purposes under the Internal Revenue Code of 1986, as subsequently amended (the "Code").  To achieve these purposes, the Contract provisions are clarified to provide as follows, despite any other provision to the contrary in the Contract (including any endorsement or rider thereto):

I.    **Required Distributions Before or After the Annuity Starting Date**

    A.    Death of Owner or Primary Annuitant, or Change of Primary Annuitant

        Subject to the alternative election, spouse beneficiary and interpretative provisions in subsection B or C immediately below, in the Tax Qualification provisions below:

        1.    If any Owner dies on or after the Annuity Starting Date (see paragraph C.1 below) and before the entire interest in this Contract has been distributed, the remaining portion of such interest shall be distributed at least as rapidly as under the method of distribution being used as of the date of such death;

        2.    If any Owner dies before the Annuity Starting Date, the entire interest in this Contract shall be distributed within 5 years after such death;

        3.    If the Owner is not an individual, then for purposes of the immediately preceding paragraph 1 or 2, (a) the Primary Annuitant (see paragraph C.2 below) under this Contract shall be treated as the Owner, and (b) any change in the Primary Annuitant allowed by this Contract shall be treated as the death of the Owner; and

        4.    Any postponement of the Annuity Starting Date, if allowed by this Contract, may not be postponed beyond the Primary Annuitant's attaining age 95, without a written election to extend the Annuity Starting Date by the Owner (if available at the time of the election)  prior to age 95 and not without our consent.

    B.    Alternative Election and Spousal Beneficiary Provisions That Satisfy Distribution Requirements

        Subject to any restrictions imposed by any regulations or other published guidance from the IRS interpreting Code section 72(s):

        1.    If any portion of the interest of an Owner described in subsection A immediately above is payable to or for the benefit of an individual designated as a beneficiary by an Owner, and such beneficiary elects after such death to have such portion distributed over a "Qualifying Distribution Period" (described herein) that is allowed by this Contract upon such death, then for purposes of satisfying the requirements of paragraph A.1 or A.2 immediately above, such portion shall be treated as distributed entirely on the date such periodic distributions begin. A "Qualifying Distribution Period" is a period that (a) does not extend beyond such beneficiary's life (or life expectancy) and (b) starts within one year after such death.

        2.    Such a designated beneficiary includes any individual joint Owner or successor Owner who becomes entitled to any portion of such an interest upon an Owner's death, or any other individual who controls the use of the cash value of such a portion upon an Owner's death.  Any designated beneficiary may elect any settlement or other distribution option that is allowed by this Contract upon an Owner's death if the option is for a Qualifying Distribution Period.  In determining which distribution options can qualify for such a Qualifying Distribution Period, we may treat any Contract amount that is payable upon an Owner's death to a trust (or other entity) for the benefit of an individual beneficiary as an interest (or portion thereof) that is payable for the benefit of such a designated beneficiary under this subsection B, where such individual beneficiary certifies to us that he or she (a) is treated as the tax owner of such a trust amount for federal income tax purposes (e.g., under Code section 671- 678) and (b) can compel its distribution to himself or herself from such trust.

3.   If any portion of the interest of an Owner described in subsection A immediately above is payable to or for the benefit of such Owner's surviving spouse (e.g., as a result of such spouse being a joint Owner), then such spouse shall be treated as the Owner with respect to such portion for purposes of the requirements of subsection A.  Where such spouse is the sole designated beneficiary of this Contract upon such Owner's death, such spouse may elect to continue this Contract as the Owner, and we may treat such spouse as the annuitant if such deceased Owner was the annuitant and no other surviving annuitant has been designated.

C.   Interpretative Provisions

Subject to any contrary provisions in any regulations or other published guidance from the IRS interpreting Code section 72(s):

1.   The Annuity Starting Date means the first day of the first period for which an amount is received as an annuity under the Contract, as defined in Code section 72(c)(4) (and any regulations thereunder).

2.   The Primary Annuitant means the individual, the events in the life of whom are of primary importance in affecting the timing or amount of the payout under the Contract, as defined in Code section 72(s)(6)(B) (and any regulations thereunder).

3.   We will treat any holder of this Contract as its Owner for purposes of subsection A or B immediately above where necessary or appropriate.

4.   Paragraphs A.1 and A.2 immediately above shall not apply to this Contract if it was issued before January 19, 1985, and was not materially changed on or after such date.

5.   Paragraph A.3 immediately above shall not apply to this Contract if it was issued before April 23, 1987, and was not materially changed on or after such date.

## II.   Tax Qualification

This Contract is intended to qualify as an annuity contract for federal income tax purposes and to satisfy the applicable requirements of Code section 72(s). To achieve these purposes, the provisions of this Contract (including this endorsement and any other endorsement or rider to the Contract) are to be interpreted to ensure or maintain such a tax qualification, despite any other provision to the contrary.  Payments and distributions under this Contract shall be made in a time and manner necessary to maintain such a tax qualification under the applicable provisions of the Code. We reserve the right to amend this Contract to reflect any clarifications that may be needed or are appropriate to maintain such a tax qualification or to conform this Contract to any applicable changes in the tax qualification requirements. We will send you a copy of any such amendment, and when required by law, we will obtain the approval of the appropriate regulatory authority.

All other provisions of this Contract remain unchanged.

MetLife Insurance Company USA has caused this Endorsement to be signed by its Secretary.

**Secretary**